Hello again. Can you state your names for the record? Good afternoon. Dan Albers for the respondent in Appalachia. Maria L. Jean Agathon from the Public Guardian's Office on behalf of the children. Assistant State's Attorney Gina DeVito for the people of the state of Illinois. All right. As you know, this doesn't amplify, only record, so keep your voices up. Do you want to reserve part of your time for rebuttal? May I please have five minutes? You certainly can. And is the state going to adopt the position of the public guardian? Yes, sir. All right. Whenever you are ready, counsel. Thank you. May it please the court, counsel? This is an unfortunate case, and we are asking the court to, as soon as possible, vacate the lower court rulings and return Maria L.'s children to her custody without any restrictions. And the courts are reversed for three principal reasons. First, the lower court's adjudication and disposition was based on speculation as to Maria L.'s mental status at the time of those orders, and based on the mere possibility that she might have a mental illness. And that might at some point create a risk of harm to her children. But the court below did not find that there was an actual mental illness at that time or that there was a risk at that time to her children. Is it necessary to find a mental illness to find an injurious environment? No. But that was the basis that the court ruled on. And so if the court's going to rule on that basis, it has to be that it does exist at that time and it does create a risk at that time. He ruled on the mere possibility of it directly in his ruling, pages 140 to 142 of the transcript. The problem with that is that the way the court ruled was he didn't hold the state to its burden of proof. When he says, well, there may be an issue, it might occur, they have not met their burden, which is a preponderance of the evidence. And the effect of that is shown by the state's own reports from its social worker, the social worker assessment, and from its psychiatrist, which both found that she had no mental illness at the time of the adjudication. So the effect of his ruling where he didn't have that information before and when he ruled on the possibility she might have it, based on the observations and conclusions of two state workers, neither of whom had any formal training with respect to mental illness. Was it two workers or one worker and one, the woman she was living with? I'm sorry, one, I'm sorry, it was the woman she was living with and one worker. And that was it. That was the entire trial. Correct. So what the court was assuming or speculating on, we now know, was not true. Also, it seems as though the trial was cut short because the court reported he had to go home. Did I read that correctly? You did the second day when there was a testimony from the woman that Roy was living with. You did cut it short at that time. Was that at the dispositional hearing or the adjudicatory hearing? I think it was at the dispositional hearing, yes. I think it was like the court reported that she had to go home soon, and he said, well, it's close to 430, we're going to end this, and just stopped all this. Yeah, there was some union issue going on and he said he had to quit. And then he ruled immediately without even continuing with testimony. Correct. The second issue on which the court should reverse is that the lower court, in making that determination about a potential mental health illness, which Maria L. turns out not to have had, wrongly considered only the actions and mental state of Maria L., not the status of her children, contrary to the Supreme Court's pronouncement and the statute, the Supreme Court's announcement in Ray Arthur, in the statute which said you look at the effect on the children. This isn't a trial about the parent or what the parent has done or not done, it's about the parent's status. It's a trial about what the state of the children are and whether what's happening is in the best interest of the children. He didn't do that either. The third issue, and perhaps most importantly, is there was no showing of any nexus between Maria L.'s supposed mental illness, which she turns out not to have had, and a real significant and imminent likelihood of harm. This is the in Ray Faith B. Supreme Court case. And the court there said if you're going to say that someone has a mental illness, a parent, and you're going to make a disposition and an adjudication based on that, you have to show not merely that they have a mental illness, but also that that mental illness puts those children at current risk. Because many people function daily with mental illness, and we've got to take the stigma out of the term mental illness. Someone could be depressed, someone could be anxious, someone could have some form of paranoia which is broadly defined in the medical field and still be functioning and not have their children at risk. So the court requires that there be that nexus shown. No such nexus was shown here. No such statement was made by the court. And there is no evidence. In fact, the evidence is directly contrary to that from the state's own witnesses. Ms. Acosta was the DCFS worker. She said she observed that the children were in good spirits and seemed to be functioning correctly and fine, and the social work report found, and there was testimony at the disposition, that the mother was functioning and she didn't see that the mother was creating any risk of harm to her children. The psychiatric report, which the court should have had and didn't have, shows that report. The trial court never had and didn't add adjudication or disavow, correct? Correct. But you're asking us to consider it even though the trial court did not. I am asking you to consider it in the best interest of the children. And it's the state's own report from their own psychiatrist. The disposition was on January 19. That report, which was 10 months after they took her children, is when they finally got it, which is 22 days later says specifically that she has no psychiatric problems or illness, she functions well, and she is not at risk or harm to her children. Because that's a religious belief that people tended, they thought may have been mental illness. Some people break the law and others don't. I think that's correct, Your Honor. And there was some reaction to that by the woman she was living with, and there was some reaction to that by the DCFS caseworker, and the court below, to his credit, said, I am not going to credit that because that's a religious belief and it's not having any effect on the children. The other thing that's important for the court to understand and to remember in deciding this case is the court below found no evidence of abuse or substantial risk of injury. So its entire decision was based on this supposition that there was some mental health problem. Is it your position that we cannot consider at all the findings in the adjudication order that the mother was observed by the DCP investigator to be uncooperative and paranoid, she spoke about evil saints, stated she could not speak to the investigator, that none of that is anything we can consider because the court did not say it in its oral ruling? I think that's one reason, and the second, and so if you look at the court's oral ruling, the only thing he relied on in the oral ruling was the state of the mental health. He didn't reference this other testimony. I think the other reason is, Your Honor, and I've addressed this in my brief, and I'm happy to go through each of those issues with you, but he found no evidence of abuse or substantial risk of injury. These are all that they're arguing now would support the court's ruling below, but the court rejected that itself. So injurious environment is a very nebulous, broad concept that almost anything can fit within, correct? It's a broad and nebulous concept, but if you've got that environment here, and the court has already said, I don't find that you have this environment over here for substantial risk or abuse, and none of these facts that have come out support that, I don't think you can take those facts and then come over here and say, well, they do fit within neglect and injurious environment, particularly when the court himself said, didn't say they did. It did go in the order, but if you look at that order, it's an order that's hard to understand, that order, because, first of all, it has one element that was in and then was scratched out with respect to whether she was previously abused herself, which they're still arguing that as a basis for supporting the court's order. It was taken scratched out of the order, and, of course, the court himself, the court below said, no, I'm not going to rely on that, and there was no evidence in any event that any abuse that she suffered herself, she allowed to continue in a way that created an environment that was harmful to the children, and she was never charged with that. No one ever raised a complaint. That's the point. That's the point. That's clearly not anything we're going to consider. The observations, for example, that the mother observed her to be uncooperative was observed by the DCP investigator to be uncooperative. Well, Ms. Acosta said that Marita had a short conversation with her. She followed her from the home she was living in to the church where she was praying, and she told her she needed to have a conversation with her or she was going to take her children from her. And then she complains that she acted paranoid and afraid. Well, I'm sorry, if you're from an indigenous tribe in Guatemala, you come to the United States, it's not your first language, someone comes to you while you're praying in a church and says, I'm going to take your children. If you don't do what I want you to do, I think you'd be afraid. And then she complains she didn't make direct eye contact with her, and she complained that she talked too fast. She talked rapidly. If someone in a position of power over you in a different culture threatens to take your kids away, you're probably not going to make direct eye contact with them. Also, she's speaking her native language, Spanish, and she's speaking probably the way I'm speaking now, which is rapid in English, but to someone who speaks Spanish, you might think it's okay, but someone who speaks Spanish is going to think it's rapid. She's speaking a different language from a different culture. If we come down to, if I don't make eye contact with you and I speak rapidly, you can take my kids away, and that's what happened here, then you can take anyone's kids away on any day. And if it comes down to there's some erratic behavior with respect to her religious beliefs, and you can now take her kids away, then again, if this is the standard, then it will be met in every case. They also complain, for example, Your Honor, and she didn't, by the way, use the term paranoia, that she violated the safety plan. But she violated the safety plan, first of all, because it was instituted under duress, because she had to go back under the supervision of the very woman that she was living with who had turned her into the DCFS. And she didn't create any risk of harm to her children by leaving that house. She went to another shelter. And you can't use the violation of the safety plan as independent evidence to support the underlying order. You have to look at what was it that led to the safety plan, what was the behavior. And that behavior was these supposed issues with respect to her behavior, which we now know there was no basis for. So that's a circuit of argument. But turn it to the environment. What about the evidence that the lower court considered about children not being fed properly and the other issues? He rejected those. They're in the order. It's in the written record. I know it's in the order. He said he didn't find any evidence of abuse. But he didn't say that they were fed correctly. He never said he rejected the testimony that they were not fed enough. Okay. So he didn't say he relied on it either. And all he said that he was doing was trying to- His argument is that if they're not being fed, they're being abused. And he just clearly said that they're not being abused. I think that's a fair conclusion to draw, Your Honor. Plus, the other thing is, the only evidence of that was from Ms. Malloy's. And what she said was, well, I didn't like that they were being fed. And then she said later, but I don't know if they were malnourished. Right. And she didn't make a charge with respect- There was not a charge made with respect to that. And they, again, didn't cross the next threshold, which would be, okay, if that's going to be the basis for it, did she create an environment which created a risk of harm to them? Where's the evidence of that? Where's the evidence of malnutrition of either child? There isn't any. And that's true with respect to all the other issues they raised with respect to the factual issues relating to the children. The court did, though, the three issues that I've addressed kind of create three other sub-issues that I think that I'd like to discuss with the court and the court should consider with respect to its ruling. First, the court below did say in making its ruling, and I do applaud the trial court's intent in wanting to protect the children, but he said, I think the case law says that I don't have to wait for the child to be hurt before I rule. But that's not what the case law says. He's talking about the doctrine of anticipatory neglect. And anticipatory neglect is if that parent had previously abused another child, or they bring another adult into the home who had previously abused another child. And the theory is, if you've got four children and you abuse one, we don't have to wait for you to abuse the other three. In order to protect them. That is not what happened here. And the problem with the court's ruling in context is, he just changed the burden of proof from the state to Maria L. in violation of her constitutional and statutory rights. Because the Supreme Court said in Arthur, where that issue was raised, and that exact line of reasoning was raised, it said, yeah, that's true, but we have to remember, these are fundamental rights of parents that we're addressing and you still must be held to your burden of proof. And Maria L. had a federal constitutional right as a fit parent to custody of her children. She has a state statutory and constitutional right. And they didn't meet their burden of proof when they come in and the court says, well, there might be a mental health issue. But their burden is preponderance of the evidence. Correct. And your burden now is to show us that it's against the manifest weight of the evidence. Correct? I think that I have three burdens I've undertaken in my briefs. One is that burden, manifest weight. Is it also considered under abusive discretion? But whether the court applied the proper standard and whether he enforced the burden of proof, I think, is a question of law. That's considered de novo. And I think when he makes his decision on the basis that might or could or the possibility, he has run afoul of both of those as a question of law. That, I think, the court can say. But relying on the possibility of a mental health issue is not legally a sufficient basis to find neglect. Correct. That's one of your positions. Yes. Two other issues. One is the part of the disposition order that they made reasonable efforts to reunify, and we're asking that to be vacated, along with the adjudication and disposition. When he didn't have the psychiatric report, he could not have made reasonable efforts to unify. If he had waited for that report 22 days and gone to lesser measures, for example, and I don't think it takes a stretch of imagination to consider this, had her lived with someone else besides Ms. Valdez, who had accused her and turned her in, putting her back to live with her was not a good idea. But put her with somebody else because the caseworker didn't believe she was that much of a risk that she couldn't be under somebody's supervision. She did that, which kind of leads to the conclusion that maybe there wasn't a mental health problem and she didn't believe there was one. So they didn't do the most they could have done to keep the family reunited. If they had, and this kind of goes to the butt floor of your prior case, if they had, 22 days later they would have had the psychiatric report and these children never would have had to leave their mother's care. And that's because the judge acted precipitously by not applying the burden of proof. If we were to reverse the finding of neglect, would we have to reach the reasonable efforts issue? Probably not. But if you do that, I wish you would because she needs a clean record because she needs to know going forward that she hasn't been found guilty by a trial court of neglect of her children. And the last issue is one that we previously discussed a little bit, which is the arguments that they've raised as to what they claim are other facts. The lower court found no abuse, no substantial risk of injury. I went through those item by item in pages two to four of my reply brief. There's nothing to show that Maria created a risk of harm to her children. And the lower court's decision is based entirely on speculation. And I'll leave the court finally with this, and I think it's appropriate. Maria L. has not had custody of her children for 18 months. Those are gone. But what we do know now because of the furor over the current national administration with respect to migrant workers is that taking young children from their parents creates harm to that relationship that could never, ever be gotten back. And the whole purpose of the law in Illinois is the best interest of the children to avoid harm. And in this case, instead of doing that, it got turned on its head. And because the court didn't enforce the burden of proof and went on separate positions in conjecture, he created harm. This court can change that now and stop the harm. Stop the harm right now. And these children are young enough because the boy was six months old and the girl was two. So she's lost part of the infancy with that child. But they're two and four now, approximately. Hopefully, if she can get them back soon enough, hopefully they won't even remember this and she can go on and rebuild that relationship. We ask that you vacate and reverse, please. Good afternoon, Your Honors. My name is Jean Agathon, and I'm representing the children in this case. I'm going to refer to the 4-year-old K.L. as the 4-year-old or the 4-year-old daughter and the infant son as the infant or the baby. I would also refer to Ms. L. as the mother. This case does not turn on whether or not the mother had a mental health diagnosis. That is an issue in the case, but the case does not turn on that. What the case turns on is whether or not the mother was able to care for her children safely and appropriately. And the case of Inouye K.T. is so squarely on point here, a 2006 case from the First District where the whole issue sort of in the trial court appeared to be whether or not the mother had a diagnosis of Munchausen syndrome by proxy, that is also factitious disorder by proxy, and whether she had that diagnosis and whether or not the diagnosis was proper or whether it had been appropriately vetted by the psychiatric community. And there was a great deal of testimony and discussion about that. The trial court said, you know what, I don't know if she has this diagnosis. What I know is that her behavior towards the children has been harmful and she has not protected them. So the First District affirmed on that basis there was a finding of NEI. And the First District said, you know, we don't know. What evidence in the record shows that she was harmful and was not protected? Well, Your Honor, if you want to get right to that, I will start on a list of, there are many different circumstances in this case. Let's start with the mother's repeated statements to the 4-year-old that nobody would ever love her, that she would only be a maid, and that nobody should be trusted. The mother at one point. And that came in through what witness? Through Ms. Valdez, the woman with whom they stayed after they were asked to leave the shelter. So also at another point, Ms. Valdez had left for the evening. When she came back, the mother grabbed her cell phone and then said something to the 4-year-old daughter. The daughter raced to the refrigerator while the mother is videotaping her using Ms. Valdez's cell phone. And then she stops recording her when the daughter gets to the refrigerator and doesn't let the daughter have any food. There was a constant issue with appropriate feeding in this case. According to Ms. Valdez, the 4-year-old was constantly asking for food. And the mother was giving her a little bit of soda, a little bit of cookies, maybe some bread and milk once in a while. Despite the fact that Ms. Valdez had told her she could have all the food in her house, and the mother had a link card so she could get groceries. They came to Ms. Valdez's house because they were sitting outside church early in April in 2017. It was a cold and windy day. Unfortunately, they did not have coats on. The baby was in a onesie, no sleeves, no pants. The girl was also in summer attire. And Ms. Valdez saw them and said, well, what's going on, where are you going? And the mother said, we're staying right here. So Ms. Valdez said, well, do you need a place to stay? Do you want to stay with me? So they went to stay with her. Prior to going with Ms. Valdez, they were staying in a shelter for a couple of weeks. The mother constantly refused to follow the rules. All that came in through hearsay, right? There was no direct testimony as to any of that stuff that came in about the shelter. Was there? There was no testimony, Your Honor. The shelter records were admitted. The records are in evidence. Okay. So the mother, and they showed that the mother received physical. And those are admissible as what? I believe they're business records, Your Honor. Okay. Yeah. They were made at the time. They showed that the mother got warning after warning about not doing things like letting the daughter sleep on the floor. Nevertheless, she let the daughter sleep on the floor a couple of times. She left the infant alone on the sofa once while she went to meet with the case manager. Just left a four-month-old infant, excuse me. She also violated the confidentiality rules by having someone drop her off right in front of the shelter. When she was told she had to leave, she said, no, no, I'm staying ten more days. And by the way, I should back up. Counsel made a comment that I believe to the effect of there was a problem with Spanish and English. That was never raised in the trial court. Ms. Acosta speaks Spanish. She testified that she spoke Spanish fluently. Ms. Valdez, with whom they were staying, is Spanish-speaking. The English-Spanish issue never was raised in the trial court. It's not an issue in this case. So she was given the warnings in Spanish and English. She was told that she had to leave. She said, no, no, I'm not going to leave. Eventually, they were taken out. It was evening, and she had been given a list of shelters, other shelters. She hadn't called them. And she sat there on the front steps of the shelter at night with this infant and 40-year-old girl. And she had no place to go. She hadn't bothered to call any shelters. And after all these warnings, she just decided she wasn't going to go. So the police had to be called. And they were taken to, I believe it was another shelter. There's also evidence that the mother hit the 4-year-old on the head on more than one occasion. Ms. Valdez testified that she heard the mother apologize to the 4-year-old for doing it. There's also evidence in these shelter records that shelter staff sat down with the mother and said, it's been reported that another client here, another resident saw you hit your 4-year-old in the head. And the mother said, well, that person should stick her nose in her own business. And that was against the shelter rules for her to do that. I also want to draw the court's attention to the unrebutted medical evidence that the 4-year-old had PTSD when she was seen by a pediatrician right after TC. She had PTSD. She also had scars on her forehead. The infant had sensory integration disorder, also known as global developmental delay. He had fine motor delay because he didn't know how to use his arms to hold a bottle. The pediatrician found that the infant was a victim of neglect, and since the 4-year-old had a diagnosis of PTSD, they were both referred by the pediatrician for other services. Was that before the trial court and the adjudicatory hearing? It was, Your Honor, yes. That was in the medical records. We should not ignore the fact that DCFS tried to help this mother. These cases are not about punishing parents. They are about protecting the children. And the DCP worker offered a safety plan. She invited the mother to sign this. The mother signed it. The mother agreed to do certain services, including having a mental health evaluation, so that DCP and DCFS could better assess what this mother's needs were. They were trying to help this mother. Instead, despite being told that she had to inform DCFS if she left the home, Ms. Valdez's home where they were staying, she left. And, yes, they went to a shelter, but DCFS did not know that. They didn't know where she was. They had to go searching for her. Ms. Acosta, the DCP worker, said that when she first met the mother, actually, the mother was speaking not only very rapidly, but somewhat incoherently. So Ms. Acosta, who had worked for three years in a mental health facility, had three years of experience with that, was very concerned about this mother's ability to take care of these children. She followed the mother to the chapel and talked to her there. Then they came back to Ms. Valdez's home. And that's where they worked out this safety plan, which the mother agreed to, but then violated. DCP, it should be emphasized, DCFS, DCP, did not remove these children from the mother because they thought she might have some abstract, interesting psychiatric diagnosis. They removed these children from their mother because they were concerned, given all the circumstances in this case and everything they learned from Ms. Valdez, they were concerned about the mother's ability to care for these children, to feed them appropriately, clothe them appropriately, give them a safe place to live, not end up on the shelter, excuse me, on the streets at night. It's my view of the mother's lawyer's position that we can only rely on the basis that the trial court articulated in his oral ruling. That's not correct, Your Honor. This court can affirm the trial court on any basis appearing in the record. The trial court's ruling may have focused on the mother's probable mental health situation, but the court can affirm, and the written, as Your Honor has pointed out, the written adjudication order. But we mentioned rice studs. Well, Your Honor, the trial court has signed it, and it is the written order of the court. I would also like to point out that counsel has mentioned several times that we now know that the mother has no mental health issues. We don't know that. Those two documents on which counsel relies were not before the trial court. No one, to my knowledge, asked for a continuance of the dispositional hearing. There was never an attempt made to say, wait a minute, you know, let's wait until we get a mental health evaluation. Those evaluations done in January. The mother's lawyer, I guess I should ask him, but something very cryptic about how they're trying to get those back before the trial court, but the trial court's docket is too full. Am I? Well, Your Honor, there was, yeah, thank you. In June of this year, there was a hearing scheduled before the trial court. After this court released limited jurisdiction, revested the trial court with limited jurisdiction to entertain a motion for return home. There was a motion for return home filed. There was a motion for no reasonable efforts filed. And those were originally scheduled on June 13th. But they haven't been heard yet. Yes, Your Honor, they were heard not on June 13th because the trial court, that was only set for a status hearing that day. So they were heard on September 7th. And they were both motions denied. So the motion for return home, the motion for no reasonable efforts denied on September 7th. The list of circumstances, factors in this family that helped to create the NEI that the trial court appropriately found would not be complete without some mention of the domestic violence that the children and the mother were exposed to. Even if it's crossed out on the written adjudication order, this court can consider it. There is a very clear history of not only the mother, but the 4-year-old daughter being exposed to domestic violence in the home. When she went to the shelter on March 9th of 2017, she did the mental health evaluation that showed that she was depressed and anxious. Although it should be noted that that mental health evaluation says, this isn't a complete evaluation, we don't have time for that. We're only doing a very sketchy mental health evaluation because our main focus is getting the mother to a safe place to live with these children. So the domestic violence evaluation that was done, the mother said that the domestic violence she was exposed to in the home had also been directed to the daughter that her husband, who was the father of the baby, had been increasingly violent over the past year, slapping and pushing the mother around. But he had also, she said, been violent to the daughter. So these children were vulnerable when they ended up in the shelter because they had already been exposed to domestic violence in the home. I'm going to ask you to make whatever final points you want to make unless there are more questions. All right. Thank you, Your Honor. Essentially, we believe that the evidence clearly does establish a pattern here that the mother is unable, for whatever reason, has been unable to provide these children. So really the question is, was properly found unable at the adjudicatory hearing, I think in January, or whenever it was? Adjudication was in October of last year, Your Honor. Correct. Right. Did the pattern of the mother's behavior show that she, that these children's environment was not safe and nurturing? As Your Honor has pointed out, NEI is an amorphous concept. It takes its meaning from the circumstances of each case. There's no two cases exactly alike. But in this particular case, the children were exposed to a variety of risks from a variety of sources. And the trial court properly found that they had been exposed to environment injuries. I have one last question. Sure. If we disagree with you and reverse in the adjudicatory order, do we reach the dispositional order or the reasonable efforts issue? Or do we just, is that, if there's no neglect, is that all we find? I believe that would be it, Your Honor, because adjudication provides the jurisdictional foundation for whatever follows. If there's no finding at adjudication, the case goes away. Thank you. Thank you. Ms. DeVito. Assistant State's Attorney Gina DeVito, on behalf of the people of the state of Illinois, we do adopt the guardian's argument today and ask that this court affirm the findings of the juvenile court below the finding of neglect. Thank you. It's a hodgepodge of issues. I'll try to address them in my five minutes. Yeah. The first thing that counsel said was that the case does not turn on the mother's mental illness diagnosis. But in her brief, she said the results of the psychiatric examination would be crucial prior to Ms. L being found fit, willing, and able to parent her children. And we agree it would be crucial, but not before she's found fit, willing, and able, but the other way around. It was crucial that they have the psychiatric examination before they took the children away in the first place because the judge said, this is the reason I'm ruling. But isn't she right that we can affirm on anything in the record, any basis in the record? Isn't she right? She's not right in this respect, and I think we did have this discussion earlier in my argument, not with respect to the issues and the facts that the judge already rejected. And he rejected any finding of abuse or substantial risk of injury, and that's all of the facts that they're addressing now all relate to those issues. So you can't reject on that basis but then say, well, I'm going to find that they created an injurious environment. If she didn't do those things to them, how does she create the environment that was injurious? And they don't ever explain how those two can coincide. The case that they cite with respect to deferring to the trial judge with respect to their factual findings, and on the findings of no abuse and no substantial risk of injury, yeah, you should defer to him. That's what I'm asking you to do. But they're not deferring to him. They're saying, well, let's go back and let's put all the stuff in the record, and then let's say, see, you can rely on that because that supports the conclusion. But it doesn't support the conclusion he reached. It had nothing to do with her mental stability or whether that was a risk to the children. But in the case they cite, Inouye William H. There's an interesting discussion, 4070 Ab 3rd, 867. And there they discuss another case, Inouye C.S. And there, in Rennery's decision, the C.S. Court acknowledged that the sole basis for the state's petition for adjudication was that the respondent was mentally disabled, which she denied. Because there was no current and complete mental examination of record, there simply was no factual basis for the trial court's holding, and it was therefore improper. And the court there remanded to get that examination. You don't have to remand here because we already have the examination, and it's completely negative. As to the other issues that she raised, I can go through my brief, pages 2 through 4. I'm going to ask you to go back, if you're concerned about what she raised, and read those pages and the citations I gave. And you'll see that there is either no factual basis for it, or that those bases were not ever connected to her, Maria L., creating a risk of harm to her child. Go to the one. And I just, I'm sorry, I do find this argument somewhat offensive. They're now arguing that because she was in a home, and she was abused, and her brother was abused, that that's evidence that she created an injurious environment. That was never the basis for any charge, for any investigation. And they're saying now, and there was never any showing that she didn't leave and continued to create a risk once she was aware of the harm that was occurring. No such evidence. And the shelter didn't make any reporting on that, which they were required to do. And the shelters never made any reports of any of these other things, which they were required to do. But now you can rely on that? I'm sorry, this is, they're blaming the wrong person. She left. She did what was right. And of course she was depressed. She was being abused and beaten. But she's now depressed. The depression is, and it's in the social worker's report, her depression is because they took her children away. We need to end this depression. This was wrong. This happened upside down. Illinois is better than this. We're better than the national administration. We follow the rule of the law. And I'm asking you to follow the rule of the law and apply the burden of proof and apply her fundamental constitutional and statutory rights as a fit parent to custody of her children. Thank you. Thank you, counsel. Thank you, everybody. Very well heartened, very well briefed, and you will hear from us shortly. And I believe that we are at a recess.